*JH*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| In re application of | ) |
| | ) |
| ALAN JAMES THOMPSON, | ) No. 05 C 1648 |
| | ) |
| Petitioner, | ) Judge Mark Filip |
| | ) |
| v. | ) |
| | ) |
| MICHELLE ANNE-MARIE BROWN, | ) |
| | ) |
| Respondent. | ) |

MEMORANDUM OPINION AND ORDER DISMISSING PETITION AND GRANTING
JUDGMENT IN FAVOR OF RESPONDENT

Petitioner, Alan James Thompson ("Petitioner" or "Mr. Thompson"), has petitioned this

Court for an order requiring the return of his son, Aaron, to England, pursuant to the Hague

Convention and the International Child Abduction Remedies Act (collectively, the

"Convention"), 42 U.S.C. §§ 11601, *et seq.* (D.E. 1 ("Petition").)[1] In the Petition, Mr.

Thompson alleges that Respondent, Michelle Anne-Marie Brown ("Respondent" or "Ms.

Brown"), Aaron's mother, wrongfully retained the child in the United States in violation of the

Convention. (*Id.*) Ms. Brown moved for summary judgment, which motion the Court denied

without prejudice. (D.E. 85.) At that time, the Court noted that Ms. Brown had presented a

strong case that the suit could fairly be resolved by way of summary judgment; however, and

particularly given the nature of the case, the Court wanted to make sure that Mr. Thompson had a

full and fair chance to present his best case as to why his Petition should not be dismissed. At

that same time, the Court made clear that the summary judgment record would still be considered

_____

[1] The designation "D.E." refers to the docket entry number of the cited document followed by the
appropriate page or paragraph number.

in connection with the resolution of the case, and that the summary judgment briefing would serve as the briefing that would accompany an evidentiary hearing at which each side could be heard.

The Court held that evidentiary hearing on December 19, 2006, and December 21, 2006. At the hearing, both Mr. Thompson and Ms. Brown testified, and the Court was able to assess the credibility of the witnesses. Based on the evidence adduced at the hearing, as well as the evidence tendered in connection with the summary judgment motion, the Court has determined that Aaron's "habitual residence" as of early 2002, the relevant date identified by Petitioner (*see, e.g.*, D.E. 78 at 2), was the United States. At the end of the day, there are few, if any, material credibility fights—although, to the extent there are such disputes, the Court resolves all credibility conflicts in favor of Ms. Brown. Although Petitioner refused to admit as much at the hearing, he *de facto* admitted in writing during the summary judgment briefing that he has no eyewitness or other concrete evidence that Aaron has been in the United Kingdom for any material period of time since 1998, including in 2002, and he also lacks any evidence that Aaron ever attended elementary school in England at any time. (*See* D.E. 68-1 ¶ 50; D.E. 76-1 ¶ 50; *see also* Hearing Transcript at 74-75 (Petitioner arguing over whether he has any evidence of Aaron ever attending school in the United Kingdom, but ultimately stating that "I didn't do the search, my attorneys did" and "I can't recall what they found." ).[2]) Mr. Thompson also has no evidence to contradict substantial, credible, documentary and testimonial evidence, including Ms. Brown's, that Aaron has attended schools in the United States since 1999, including during the

---

[2] In preparing this final opinion, the Court has reviewed and relied upon a rough transcript of the hearing. Neither party has yet ordered the transcript, so it is not filed as a docket entry. Either party can obtain a copy of the official transcript through the ordinary procedures established in the courthouse.

2

2000-01, 2001-02, and 2002-03 school years. (*See, e.g.*, D.E. 68-1,¶ 51 and related exhibits; D.E. 76-1 ¶ 51; Hearing Transcript at 118 (Ms. Brown stating that Aaron attended Loop Lab, Holmes Elementary, and Ogden School, and has never attended school outside the United States).) As mentioned, to the extent there are credibility disputes in the record concerning Aaron's "habitual residence," the Court resolves those credibility issues in favor of Ms. Brown. For the reasons explained below, the Court respectfully dismisses the Petition and enters judgment in favor of Ms. Brown, Aaron's mother.[3]

---

[3] At the outset of this decision, the Court wants to recognize and thank all of the attorneys who appeared *pro bono*—for Mr. Thompson, David A. Wheeler, Esq.; for Ms. Brown, Heather Kuhn O'Toole, Esq., and Brian P. Netols, Esq.; and, as Guardians Ad Litem for Aaron, Sheila Finnegan, Esq., and Robert F. Harris, Esq., the Cook County Public Guardian, and his colleague, Lisa K. Nelson, Esq. All *pro bono* counsel did an exemplary job—during the in-court litigation; during the extensive efforts to settle the case, which settlement efforts ultimately proved unavailing despite substantial promising signals; and during the briefing and discovery phases of the litigation. The Court also wishes to extend a special thank you to the United States Marshall Service. When proceedings such as the instant one occur, they begin with an "arrest" of the blameless child so as to bring that child before the authority of the Court. The United States Marshall Service put together a special team of Deputy Marshals who could safely take custody of Aaron and also could attempt to simultaneously ensure that he was not emotionally harmed by the proceedings or this case. The Marshal Service assembled a special team of Deputies, led by Deputy U.S. Marshall Melody Waldron, who began their efforts at 3:30 a.m. on the day of the "arrest." They thereafter spent the remainder of the day attempting to ensure that Aaron was not disturbed by the process, and their efforts were quite successful under the circumstances. Neither the federal law enforcement system, nor the federal courts generally, are designed or well-equipped to deal with child-custody or domestic disputes involving immediate child-custody issues; the United States Marshall Service went above and beyond the call of duty to ensure that the numerous issues attendant to taking Aaron into custody were handled in the most professional and compassionate manner possible. The Cook County Guardian's Office also did exemplary work—repeatedly checking in on Aaron during the proceedings (he was eventually placed by agreement of the parties back with his mother, Ms. Brown) to ensure that he was doing well and was safely within the jurisdiction of the Court.

3

## RELEVANT FACTS[4]

Eleven years ago, when Mr. Thompson and Ms. Brown's son, Aaron, was born, both parents were living in London, England. (D.E. 76-1 ¶¶ 1-2, 5.) While both parties acknowledge that Mr. Thompson is Aaron's biological child, the parties were never married. They did continue in a professional relationship after Aaron was born. (*Id.* ¶ 6.) Approximately six

---

[4] Caselaw teaches that a Court may resolve factual issues attendant to a Petition such as the one at issue here by a wide variety of evidentiary and procedural vehicles. *See, e.g., March v. Levine,* 136 F.Supp.2d 831, 834 (M.D. Tenn. 2000) (collecting numerous federal appellate authorities). Caselaw similarly reflects that discovery need not be permitted, nor need a Court afford the parties an evidentiary hearing. *See, e.g., id.* (collecting cases). In this case, the Court has afforded the parties broader rights, not narrower ones, and agreed to permit bi-lateral discovery and also held an evidentiary hearing at which both sides could be heard.

In connection with that hearing, the Court also has considered the summary judgment records tendered by the parties, as evaluated by well-settled Seventh Circuit law concerning summary judgment materials. (These documents include: Respondent's "Rule 56.1 Statement of Undisputed Facts" (also "Resp. SF") (D.E. 68-1); Petitioner's "Response to Respondent's LR 56.1 Statement of Facts" (also "Pet. Res. to SF") (D.E. 76-1); and "Respondent's Response to Additional Undisputed Facts Alleged by Petitioner in Opposition to Respondent's Motion for Summary Judgment" (also "Resp. to Add. SF") (D.E. 82-1).) Local Rule 56.1 ("L.R. 56.1") requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). Where a party has offered a legal conclusion without offering proper evidentiary support, the Court will not consider that statement. *See, e.g., Malec,* 191 F.R.D. at 583 ("[A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions."); *id.* ("Factual allegations not properly supported by citation to the record are nullities."). Additionally, where a party denies a statement of fact by failing to provide adequate or proper record support for the denial, the statement of fact is properly deemed admitted. *See* L.R. 56.1(a), (b)(3)(B); *Malec,* 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission); *see also, e.g., Koszola v. Bd. of Ed. of City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004) (a district court has broad discretion to require strict compliance with L.R. 56.1); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (same) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1316 (7th Cir. 1995) (collecting cases). This rule, for example, prompts the Court to disregard Mr. Thompson's unsupported denials in response to paragraphs 51-59 of Respondent's SF, as his assertions that the facts are "not thus far contained in the record" are insufficient to support his denial; in this regard, the Court gave Mr. Thompson an opportunity to present evidence on these subjects and he did not present anything credible to refute Ms. Brown's position on the issues relevant for present purposes—for example, that Aaron has always attended school in the United States and that he has never attended school in England. (D.E. 76-1 ¶¶ 51-59.) Mr. Thompson's failure to credibly support his denials of certain other well-supported factual assertions, even after a hearing, resulting in those facts being deemed admitted, is also noted, *infra,* where applicable.

4

months after Aaron's birth, Mr. Thompson, a British citizen, moved from London to Chicago, Illinois, to run a publication called "Shop Talk." (*Id.* ¶ 7.) Ms. Brown, also a British citizen, did not move at this time, but instead stayed in London with Aaron. (*Id.*) Prior to moving to Chicago, Mr. Thompson sold his home in England and gave his automobile away. (D.E. 68-1 ¶ 8.)[5] In April 1996, Ms. Brown moved with then ten-month-old Aaron to Chicago in order to work with Mr. Thompson for "Sui Generis," the holding company for Shop Talk. (D.E. 76-1 ¶ 9.) Before leaving England, Ms. Brown sold effectively all of her personal belongings—all except the three suitcases she brought with her to Chicago. (*Id.*)

When they arrived in Chicago, Ms. Brown and Aaron moved into an apartment located at 440 N. Wabash Street. (D.E. 76-1 ¶ 10.) At the time, Mr. Thompson was living in this same building, but in a separate apartment from Ms. Brown and Aaron. (*Id.*) Ms. Brown and Aaron, and Mr. Thompson, respectively, resided at 440 N. Wabash for nearly two years, from April 1996 until January 14, 1998, when Ms. Brown abruptly resigned her position at Sui Generis and returned with Aaron to England. (*Id.* ¶¶ 11, 15.)

Also on January 14, 1998, Mr. Thompson filed a missing person report with the Chicago Police Department stating that Ms. Brown had gone missing. (*Id.* ¶ 16.) Soon thereafter, the

---

[5] These facts asserted by Ms. Brown are supported by her citation to Mr. Thompson's deposition. (D.E. 68-3.) In his briefing, Mr. Thompson neither admits nor denies these facts specifically, but states instead that he "never took any steps toward becoming a permanent legal resident of the United States and relies [o]n U.K. Petition to the extent it reflects intent to remain in the U.K." (D.E. 76-1 ¶ 8.) Precedent instructs the Court to consider Mr. Thompson's failure to deny these well-supported facts as an admission. *See Malec*, 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). At the hearing, Mr. Thompson first testified that he did not sell his real property prior to moving to Chicago. (Hearing Transcript at 51.) When he was impeached with his sworn testimony to the contrary, he acknowledged the prior under-oath testimony. (*Id.* at 52.) The Court credits evidence that Mr. Thompson indeed sold his real property in England prior to relocating to Chicago.

5

parties both initiated separate legal proceedings relating to Aaron. For her part, Ms. Brown

petitioned the United Kingdom High Court in January 1998 for a "residence order" establishing

Aaron's residence as England. (*Id.* ¶ 17.) Conversely, Mr. Thompson petitioned the Circuit

Court of Cook County, Illinois, seeking custody of Aaron and seeking to prevent Ms. Brown

from removing Aaron from Illinois (although Aaron had already left Illinois with Ms. Brown at

this time). (*Id.* ¶ 18.) The parties continued their attempts to litigate Aaron's custody and

residence in these separate fora until February 12, 1999, when the High Court in England

"dismissed Ms. Brown's application for residence on the basis that Mr. Thompson would be

pursuing further applications in the U.S." (*Id.* ¶ 23.) Based on this ruling, Ms. Brown decided to

live in Illinois until a custody decision was reached and enrolled Aaron, then three years old, in

school at the Loop Lab School in Chicago on February 16, 1999.[6] (*Id.* ¶ 24.)

Aaron Brown remained enrolled at the Loop Lab School until he graduated in 2001, while

his parents participated in "highly contentious" custody proceedings in the Circuit Court of Cook

County. (D.E. 68-1 ¶ 26; D.E. 76-1 ¶ 26.) In the course of these proceedings, Mr. Thompson's

request for custody of Aaron was denied and Mr. Thompson was ordered to pay child support,

which he seemingly has never done. (D.E. 68-1 ¶¶ 27, 30; D.E. 76-1 ¶¶ 27, 30.)[7] Ms. Brown

---

[6] While testifying, Ms. Brown agreed that she was "forced against her will and against her intention to return to the U.S." to continue this custody battle. (Hearing Transcript at 100.) Later on in her testimony, however, she explained that as the custody proceedings progressed, "probably in early 2000," her intentions to return to the United Kingdom changed as a result of the ongoing litigation, her relationship with her now fiancé (who is American), and the dismissal of the British proceedings. (*Id.* at 119-120.)

[7] Although Mr. Thompson denies this well-supported factual averment (D.E. 76-1 ¶¶ 27, 30), he offers no evidence in support of his denial, and the averment is credited for present purposes. *See, e.g., Malec,* 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission).

claims that at some point in the winter of 2000, although Ms. Brown continued to make Aaron available, Mr. Thompson began to skip his visitations with Aaron. (D.E. 68-1 ¶ 33.)[8] As a result, Ms. Brown claims, she sent a letter by certified mail to Mr. Thompson at his business address informing him that he could contact her attorney if he wished to visit with Aaron or pay child support. (D.E. 68-1 ¶ 34.)[9] Thereafter, at some point in 2001, Mr. Thompson returned to England, while Ms. Brown and Aaron continued to reside in Illinois. (D.E. 76-1 ¶ 35.)

The parties agree that during the summer of 2001, Ms. Brown and Aaron moved to Oak Park, Illinois. (D.E. 76-1 ¶ 37.) (Still, shortly thereafter, on October 19, 2001, Mr. Thompson represented to the Circuit Court of Cook County that Aaron and Ms. Brown were living in England.[10]) Petitioner further admits that Aaron attended Holmes Elementary in Oak Park,

_____

[8] Although Mr. Thompson denies this well-supported factual averment (D.E. 76-1 ¶ 33), he offers no evidence in support of his denial, and the averment is credited for present purposes. *See, e.g., Malec,* 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). Any potential testimony that Mr. Thompson offered to the contrary is respectfully rejected as not credible, particularly given that Mr. Thompson stated, *inter alia,* that he did not know when he last visited with his son; had "no idea" whether this event occurred in 1999, 2000, 2001, or presumably some other time; and further stated that, when he returned to England in 2001, he could not recall whether he thought Aaron was living in England then or in the United States. (Hearing Transcript at 66-67.)

[9] Although Mr. Thompson denies this well-supported factual averment (D.E. 76-1 ¶ 34), he offers no evidence in support of his denial, and the averment is therefore credited. *See, e.g., Malec,* 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission); *see also* Hearing Transcript at 70 (acknowledging that business address was a correct one).

[10] Mr. Thompson asserts that "the last Cook County Court Order entered in this case states that the U.K. Courts have jurisdiction over the custody matter because it has determined that the Respondent and Aaron returned to the U.K." (D.E. 76-1 ¶ 60.) However, the Court's examination of the October 19, 2001 order attached to Petitioner's Response to Respondent's L.R. 56.1 Statement of Facts as Exhibit E (also Hearing Ex. 31), reflects that the order is most fairly read to indicate that the Cook County Court made no independent determination that Aaron and Ms. Brown had actually returned to England, but rather merely stated that Mr. Thompson represented as much to the Cook County Court. (*See* D.E. 76-1, Exhibit E (Cook County Circuit Court Order stating that, "This cause before this Court on a Return of the 'Rule to Show Cause' issued against Respondent/mother for her failure to comply with the Court's order

Illinois during the 2001-2002 and 2002-2003 school years. (D.E. 76-1 ¶ 40; *see also* D.E. 68-1 ¶ 51.[11]) In support of this point, Respondent offered both her own testimony (Hearing Transcript at 118) and Aaron's school records from Holmes Elementary in Oak Park, Illinois, which indicate that Aaron was in first grade there for the 2001-2002 school year, attending school 159.5 days that school year, and being absent 16.5 days. (*See* D.E. 68-17.) Holmes Elementary School's records also indicate that Aaron attended school there during the 2002-2003 school year, attending 160.5 days and being absent 16.5 days. (*Id.*)[12]

On January 29, 2002, Mr. Thompson filed an "Application in England pursuant to the Children Act 1989, seeking a residence order and further seeking leave to take Aaron to live with him in the United States." (D.E. 76-1 ¶ 48.) On January 31, 2002, Mr. Thompson filed an application "with the Principal Registry in England, seeking parental responsibility, interim contact, prohibited steps, and in the alternative, a residence order and leave to remove Aaron to

---

allowing Petitioner/father full rights of visitation, father unable to serve her in this Jurisdiction, he representing that she now resides in Birmingham . . . England . . . .").)

[11]  Although Mr. Thompson denies the well-supported factual averment in Respondent's SF at ¶ 51, which further establishes that Aaron attended school in the United States since 1999, Mr. Thompson offers no evidence in support of his denial (D.E. 76-1 ¶ 51), and the averment is credited for present purposes. *See, e.g., Malec*, 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). Furthermore, the Court credits Ms. Brown's testimony that Aaron attended school in Illinois as reflected above. (*See* Hearing Transcript at 118.) Any vague speculation or equivocation by Mr. Thompson at the hearing that there may be some unspecified evidence reflecting that Aaron attended school in the United Kingdom is respectfully rejected—particularly in light of the fact that Mr. Thompson stated that he and his attorneys undertook comprehensive record searches with English educational authorities, which revealed no evidence that Aaron attended school there. (Hearing Transcript at 44-46, 70-71.)

[12]  Even though he previously admitted that Aaron did indeed attend these schools on these dates, at the hearing Respondent attempted to argue that the school records are inauthentic and inadmissible. Even without reference to the school records themselves, however, the combination of Ms. Brown's testimony and Mr. Thompson's admissions lead the Court to conclude that Aaron has attended school in the United States, and exclusively in the United States, since 1999. (D.E. 76-1 ¶ 40; D.E. 68-1 ¶ 51; Hearing Transcript at 118.)

8

the U.S." (D.E. 76-1 ¶ 38.) Mr. Thompson contends that Ms. Brown was personally served with this application for parental responsibility on February 5, 2002 in Birmingham, England, and submits an affidavit from "U.K. Process Server Nigel Fielden" of "Insight Investigations" attesting without substantial detail to such service. (D.E. 76-1 ¶ 39: *see also id.*, Ex. F.)

Although the Court need not resolve the issue to adjudicate the issues before the Court, the Court notes that it is at best ambiguous (from Mr. Thompson's perspective) as to whether Ms. Brown ever was served on February 5, 2002. Ms. Brown credibly denied that she was served with the application on February 5, 2002 and offered both an affidavit and her credible testimony attesting that she was not present in England on that date. (*See* D.E. 68-1 ¶ 39; D.E. 68-2 ¶ 25; Hearing Transcript at 109.) There also is a March 4, 2002 letter to Mr. Thompson from Insight Investigations stating that despite numerous attempts, it had been unable to meet with Ms. Brown or serve her. (D.E. 68-1 ¶ 39; D.E. 68-16.) Furthermore, the affidavit stating that Nigel Fielden served Ms. Brown contains none of the particulars (*i.e.*, the served person's height, weight, age, race, etc.) that one normally would see in an American return of service, which particulars enhance the credibility of the assertion of service.

Regardless of whether Ms. Brown was served on February 5, 2002, that alone hardly proves that she, let alone Aaron, was a "habitual resident" of England at the time. Moreover, and even more to the point, Mr. Thompson does not aver or offer any evidence indicating that Aaron was in England in February 2002, or at anytime in 2002. Rather, Mr. Thompson testified that he did extensive public records searches for Ms. Brown and Aaron in the United Kingdom around this time and all such searches failed to reveal Aaron's presence in England at any time after 1998. (Hearing Transcript at 70-71.) As explained, Mr. Thompson admitted that he has "not

9

seen Ms. Brown or Aaron in England since 1996, nor can he identify a single person who has seen Aaron in England since 1998." (D.E. 76-1 ¶ 50.) In addition, Ms. Brown's testimony and Aaron's school records document that Aaron was in school in Oak Park, Illinois on January 30, 2002 and February 1, 2002. (*See* D.E. 68-17; *see also* Hearing Transcript at 118.) Mr. Thompson also admits that he visited Ms. Brown and Aaron's residence in Oak Park, Illinois in or around the fall of 2002. (D.E. 76-1 ¶¶ 41, 45.[13])

In December 2002, Ms. Brown and Aaron moved from Oak Park to Chicago, although Aaron finished out the school year in Oak Park. In September 2003, Aaron began school at Ogden Elementary in Chicago, where he attended third, fourth and fifth grades from 2003 through the 2005-2006 school years and where he currently attends. (D.E. 68-1 ¶ 46; D.E. 76-1 ¶ 46[14]; Hearing Transcript at 118.)

On March 29, 2004, Mr. Thompson filed an application pursuant to the Hague Convention on the Civil Aspects of International Child Abduction with the National Center for

---

[13]  Although Mr. Thompson denies the well-supported factual averment in Respondent's SF at ¶ 41, which establishes that he visited Ms. Brown's and Aaron's home in Oak Park in the early fall of 2002, Mr. Thompson offers no evidence in support of his denial (D.E. 76-1 ¶ 51), and the averment is credited for present purposes. *See, e.g., Malec*, 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). Furthermore, Mr. Thompson admits that he "contacted DCFS after visiting Petitioner's [the Court assumes he meant "Respondent's"] Oak Park address," thereby conceding that he did in fact visit Ms. Brown's home in Oak Park. (D.E. 76-1 ¶ 45.) Respondent attests that Mr. Thompson's charges against her with DCFS were "deemed unfounded" (D.E. 68-1 ¶ 45), a claim that Mr. Thompson also denies without any evidentiary support and her assertion is thus deemed admitted. (D.E. 76-1 ¶ 45.)

[14]  Although Mr. Thompson denies the well-supported factual averment in Respondent's SF at ¶ 46, which establishes that Aaron attended school in Chicago from 2003-2006, Mr. Thompson offers no evidence in support of his denial (D.E. 76-1 ¶ 51), and the averment is credited for present purposes. *See, e.g., Malec*, 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). Furthermore, the Court credits Ms. Brown's testimony that Aaron attended school in Illinois as reflected above.

10

Missing and Exploited Children, which application alleged that Ms. Brown removed Aaron from England to the United States sometime around February 5, 2002. Petitioner subsequently filed a "Petition for Return of Child Pursuant to the Hague Convention" with this Court, initiating the present action. (D.E. 1.)

## DISCUSSION

The International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 et seq. (also, "ICARA"), which implements the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), entitles a person whose child has been wrongfully removed to the United States to petition a federal court to order the child returned. 42 U.S.C. § 11603(b). "The convention is aimed at parties to custody battles who remove the child from the child's domicile to a country whose courts the removing parent thinks more likely to side with that parent." *Kijowska v. Haines*, 463 F.3d 583, 586 (7th Cir. 2006) (citations omitted).

Federal courts do not typically adjudicate the merits of child custody disputes. The Convention does not fundamentally change that aspect of the jurisprudential landscape. As stated in *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269 (N.D. Ga. 2004):

[T]he court's role in applying the Hague Convention is not to resolve the merits of any [child] custody issue. Rather, the court is to determine whether the child was removed or retained wrongfully from the child's habitual residence.

*Id.* at 1275-76 (collecting federal appellate cases); *accord, e.g., Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998) (collecting cases and stating, "[a] court considering an ICARA petition has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute."). In this regard, Article 3 of the Convention specifies that:

11

The removal or the retention of a child is to be considered wrongful where -

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State *in which the child was habitually resident immediately before removal or retention*; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been exercised but for the removal or retention.

Convention, art. 3, 19 I.L.M. at 1501 (emphasis added).

The parties agree that, under the Convention, it is Petitioner's burden to show by a preponderance of the evidence that Respondent's retention of Aaron was "wrongful." (D.E. 67-2 at 2; D.E. 78 at 2.) In order to prove this, the parties agree, Mr. Thompson must demonstrate by a preponderance of the evidence that, among other things, Ms. Brown removed or retained Aaron away from his habitual residence in early 2002. (*See* D.E. 67-2 at 2-3; D.E. 78 at 2 (citing, *inter alia*, *Fabri v. Pritikin-Fabri*, 221 F.Supp.2d 859, 863 (N.D. Ill. 2001)).

In this regard, caselaw instructs that in determining whether a child has been wrongfully removed or retained under the Convention, courts should address "a series of four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?" *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001); *accord, e.g., Fabri*, 221 F. Supp. 2d at 863 (collecting federal appellate authorities). As discussed below, the answers to the first two questions here lead the Court to conclude that Aaron was not wrongfully retained or removed from his habitual residence in early 2002, as his habitual residence at that time was in the United

12

States. Therefore, no further analysis is necessary and Ms. Brown is entitled to judgment in her favor. *See, e.g., Koch v. Koch*, 450 F.3d 703, 710 (7th Cir. 2006); *Falls v. Downie*, 871 F. Supp. 100, 102 (D. Mass. 1994) (collecting cases and stating, "[a] key prerequisite to exercise of jurisdiction under the Convention is that the child be removed or retained from . . . [his or her] 'habitual residence.'").

A.     Date of Allegedly Wrongful Removal or Retention

The timing of the allegedly wrongful removal or retention is material, as the Court is required by the Convention to determine where Aaron was "habitually resident immediately before removal or retention." Convention, art. 3, 19 I.L.M. at 1501. In this regard, Mr. Thompson alleges that "[o]n March 5, 2002, Respondent [*i.e.*, Ms. Brown] commenced the wrongful retention of the child outside of England within the meaning of Article 3 of the Convention and continues to wrongfully retain the child in the United States despite efforts on the part of the Petitioner [*i.e.*, Mr. Thompson] to have the child returned to his habitual residence in England." (D.E. 1 ¶ 9.) The Court therefore proceeds in analyzing Aaron's habitual residence "immediately before" March 5, 2002. Convention, art. 3, 19 I.L.M. at 1501; *accord Mozes*, 239 F.3d at 1070-1071 (analyzing children's "habitual residence" as of the date petitioner claimed respondent wrongfully retained the children).[15]

B.     Habitual Residence Analysis

This motion turns, at least in substantial part, on the determination of Aaron's habitual residence. If Aaron's habitual residence at the time of his alleged removal from England on

---

[15] The exact date is ultimately not significant, although the Court uses the date identified by Mr. Thompson. Given the record assembled, Ms. Brown is entitled to judgment under applicable precedent using any number of potentially relevant dates, as explained further herein.

13

March 5, 2002 "was the United States, then . . . [Ms. Brown's alleged] removal of . . . [Aaron] to the United States would not be considered wrongful under the Convention." *Koch*, 450 F.3d at 710; *accord, e.g., Sasson v. Sasson*, 327 F. Supp. 2d 489, 494 (D. N.J. 2004) ("Removal or retention under the Hague Convention is only wrongful if the child is removed from his or her 'habitual residence.'") (collecting cases; internal quotation marks omitted). Conversely, if Aaron's "habitual residence" as of March 5, 2002 was England, the Court's analysis of whether he has been wrongfully removed or retained under the Convention would logically continue. For the reasons stated below, the Court finds that, on the basis of the evidence produced, the record establishes that Aaron's "habitual residence" in March 2002 was in the United States. Put differently, Mr. Thompson has failed to discharge his burden of establishing by a preponderance of the evidence adduced that Aaron's "habitual residence" in March 2002 was in England.

            1.      The Parties De Facto Agree that Aaron Has Attended School in Illinois Since 1999, Including During the 2001-02 School Year.

As a preliminary matter, the Court notes that there is no colorable factual dispute between the parties that Aaron attended school in Illinois in the 2001-02 school year. (*See, e.g.*, D.E. 76-1 ¶ 40) (Petitioner admitting that Aaron attended school in Oak Park, Illinois during the 2001-2002 and 2002-2003 school years[16]); *see also* D.E. 68-1 ¶ 51 (documenting that Aaron has attended school in the United States since 1999); Hearing Transcript at 118 (Ms. Brown credibly testifying

---

[16] The evidence in the record leaves no doubt of this conclusion, nor does it reasonably permit hypothesizing about whether Aaron was somehow attending school in Illinois and also in England. Specifically, in both the 2001-02 and 2002-03 school years, Aaron was in school in Illinois for approximately 160 of 176 scheduled school days. (*See* D.E. 68-17.) Even were the Court to disregard the school records, however, Ms. Brown credibly testified that Aaron attended Holmes Elementary during the 2001-2002 and 2002-2003 school years and that he has never attended school outside the United States. (Hearing Transcript at 118.)

that Aaron attended Holmes Elementary in Oak Park, Illinois for the 2001-2002 school year and never attended school in the United Kingdom). In addition, there is no dispute that, based on the information provided to the Court in the respective Local Rule 56.1 materials, the only places Aaron has resided in his life are England and the suburbs and city of Chicago, Illinois. More specifically, the parties agree that Aaron was born in England in 1995, where he lived until 1996. (D.E. 76-1 ¶¶ 1, 9.) The parties further agree that, with the consent of both of his parents, Aaron moved to Chicago, Illinois, with his mother, where he and both of his parents lived from 1996 until January 1998. (D.E. 76-1 ¶ 9.) The parties further agree that in January 1998, Aaron moved with Ms. Brown back to England, resulting in Mr. Thompson filing a report with the Chicago Police Department claiming that Ms. Brown had gone missing. (D.E. 76-1 ¶¶ 15, 16.) The parties agree that on January 20, 1998, Mr. Thompson petitioned the Circuit Court of Cook County seeking an Ex Parte Order of Protection, custody of Aaron, and to prevent Ms. Brown from removing Aaron from Illinois. (D.E. 76-1 ¶ 18.)

Significantly, as a result of the ongoing custody proceedings initiated by Mr. Thompson in Illinois, the parties concur that Ms. Brown returned to Illinois with Aaron in 1999 and enrolled Aaron in school. (*See* D.E. 68 ¶ 24; D.E. 76-1 ¶ 24.)[17] Aaron attended school in Illinois in 1999

---

[17] In his "Response to Respondent's LR 56.1 Statement of Facts," Mr. Thompson admits that Aaron attended school in Chicago in 1999, but denies that Ms. Brown was "forced" to remain in Illinois due to the ongoing litigation he initiated, claiming that Ms. Brown "has produced no credible evidence concerning this allegation." (D.E. 76-1 ¶ 24.) With all respect to Petitioner's position, Ms. Brown has offered an affidavit and testifies that "after learning that [she] would be forced to remain in the U.S. until the resolution of the custody proceedings was reached, on February 16, 1999, I enrolled three-year-old Aaron at the Loop Lap School. . ." (D.E. 68-2 ¶ 15.) Moreover, Mr. Thompson's attorney elicited this same testimony by asking Ms. Brown to confirm that she was "forced against her will and against her intention to return to the U.S." to continue this custody battle. (Hearing Transcript at 100.) As Ms. Brown also credibly explained, however, her intentions about remaining in the United States changed back again in favor of staying as she came to appreciate that the custody litigation would take a long time to resolve here and as she became attached to her fiancé, who is American. (*Id.* at 103, 119.)

(beginning in February) and has continued to attend school in Illinois consecutively during every

school year since then. (*See, e.g.,* D.E. 68 ¶¶ 24, 40, 46; D.E. 76-1 ¶¶ 24, 40, 46[18]; Hearing

Transcript at 118.) Therefore, the record reflects that Aaron has resided in Illinois with Ms.

Brown since 1999.[19] (*See, e.g.,* D.E. 68 ¶¶ 24, 40, 46, 50; D.E. 76-1 ¶¶ 24, 40, 46, 50; Hearing

Transcript at 120-121 (Ms. Brown testifying that the longest she has spent in the United

Kingdom since the Fall of 1998 is two weeks).) Logically, the undisputed facts alone might lead

to the conclusion that on March 5, 2002, Aaron was a habitual resident of Illinois, as the

evidence presented to the Court indicates that he had attended school here continuously for

nearly three years at that point, from 1999-2002. *Accord Koch,* 450 F.3d at 713 ("'If you've

lived continuously in the same place for several years on end, for example, we would be hard-

pressed to conclude that you had not abandoned any prior habitual residence.'") (quoting *Mozes,*

239 F.3d at 1075). Although it might do so, the Court does not conclude its analysis here.

Further analysis, however, simply serves to reinforce that Ms. Brown is entitled to judgment in

---

[18] As stated above, Although Mr. Thompson denies the well-supported factual averment in Resp. SF at ¶ 46, which establishes that Aaron attended school in Chicago from 2003-2006, Mr. Thompson offers no evidence in support of his denial (D.E. 76-1 ¶ 51), and the averment is credited for present purposes. *See, e.g., Malec,* 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission).

[19] The Court respectfully rejects any suggestion by Mr. Thompson (*see* D.E. 76-1 ¶ 60) that an order issued by the Cook County Circuit Court in October 2001 establishes or even meaningfully suggests that Aaron was habitually resident in England in the Fall of 2001. As explained, the Court has reviewed the October 19, 2001 order (which is attached as Exhibit E to Petitioner's Response to Respondent's L.R. 56 Statement of Facts; *see also* Hearing Ex. 31). Fairly read, it reflects that the Cook County Court made no independent determination about Aaron's residence, but rather accepted Petitioner's representation of this fact. (Neither Ms. Brown nor Aaron were present at the proceedings at which Mr. Thompson made this representation.) Simply put, Mr. Thompson offers no meaningful evidence that Aaron resided in England in 2001, nor does he make any attempt to reconcile his claim that Aaron resided in London in October 2001 with his *de facto* admission elsewhere that Aaron attended school full-time in Illinois at the same time.

16

these limited threshold[20] proceedings.

> 2. The Parties Shared An Intent To Abandon England As Their Habitual Residence

Although the Court might, based on the agreed facts described above, conclude that Aaron was a habitual resident of Illinois in March 2002, recent Seventh Circuit precedent instructs that courts should consider the intent of the parents when performing habitual residence analysis under the Convention. *See Koch*, 450 F.3d at 713. In this regard, "'[t]he first step in acquiring a new habitual residence is forming a settled intention to abandon the one left behind. Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration.'" *Id.* (quoting *Mozes*, 239 F.3d at 1075). As described below, the evidence in the record leads the Court to conclude that Aaron had abandoned his birth residence in England and acquired a new habitual residence in Illinois as of March 2002.

Ms. Brown urges the Court to adopt the Third Circuit's finding that "a child's habitual residence is the place where he or she has physically been present for an amount of time sufficient for acclimatization and which has a degree of 'settled purpose' from the child's perspective." (D.E. 67-2 at 4 (citing *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (internal quotation marks omitted).) As discussed above, this approach leads to the conclusion that Aaron was a habitual resident of Illinois in March 2002, as he had been attending school there since 1999.[21] The Seventh Circuit teaches, however, that courts analyzing the issue of

---

[20] As emphasized elsewhere, this proceeding is in no way a child custody determination. Hague Convention proceedings of this type involve limited inquiries only. Child custody issues are resolved in a family law court in the appropriate forum state or nation.

[21] The record also reflects that Aaron has no friends in England and that, since 1998, the longest period of time he has been in England was for approximately one to two weeks, when he and Ms. Brown visited

17

habitual residence under the Convention should look to "whether the parents shared an intent to abandon the prior habitual residence." *Koch*, 450 F.3d at 715 (citing *Mozes*, 239 F.3d 1067). In determining this parental intent, the Seventh Circuit looked favorably upon circuits that "focused on the parents' last shared intent in determining habitual residence." *Koch*, 415 F.3d at 715 (collecting cases).

As is the case here, precedent recognizes that "by the time one parent has filed an action under the Convention for the return of a child, the parents no longer share an intent on the child's habitual residence." *Koch*, 450 F.3d at 713; *accord Mozes*, 239 F.3d at 1076. In these instances, "representations of the parties" about topics such as shared intent "likely cannot be accepted at face value," so a court should determine "'from all of the available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is.'" *Koch*, 450 F.3d at 713 (quoting *Mozes*, 239 F.3d at 1076). The Seventh and Ninth Circuits recognize various situations in which such a factual scenario might exist, two of which are arguably similar to the case *sub judice*, and both of which lead to a finding that on and about March 5, 2002, Aaron was a habitual resident of the United States.

In analyzing whether a child's parents shared an intent to abandon a prior habitual residence and adopt a new one, the Seventh and Ninth Circuits "included at one end of the spectrum [(*i.e.*, as an easy case), situations involving] families which jointly take all the steps associated with abandoning habitual residence in one country to take it up in another." *Koch*, 450 F.3d at 713 (internal citations omitted). In such a situation, a court "would generally be unwilling to let one parent's [alleged] reservations about the move stand in the way of finding a

---

with her friends and family there. (D.E. 68-1 ¶ 59; *see also* Hearing Transcript at 120-21.)

18

shared and settled purpose" to relocate habitual residence to the new country. *Id.* (internal citations omitted). Another possibility, in the middle-ground where all of the circumstances and facts must be assessed, are "cases where the petitioning parent earlier consented to let the child stay abroad for some period of ambiguous duration. In these cases, the circumstances surrounding the child's stay may sometimes suggest that, despite the [possible] lack of perfect consensus, the parents intended the stay to be indefinite, leading to an abandonment of the prior habitual residence." *Id.* (internal citations omitted). The instant case could be analogized to either of these two scenarios, depending on the point in time in which the last shared intent of the parties is analyzed. However, regardless of which category this case best fits into, the record establishes that the habitual residence for Aaron in March 2002 was in the United States and not in England, as explained below.

a. *The Parties Took Joint Steps to Abandon England and Establish Habitual Residence in Illinois in 1996*

Based on the facts presented to the Court, there are two possible instances that might form the "parents' last shared intent in determining habitual residence." *Koch*, 450 F.3d at 715 (collecting federal appellate precedent). The first instance is the period in 1996 when Mr. Thompson and then Ms. Brown and Aaron initially left England and moved to the United States. This factual scenario is analogous to the situation described in *Koch* where "families . . . jointly take all the steps associated with abandoning habitual residence in one country to take it up in another." *Id.*, 450 F.3d at 713. The vast majority of evidence presented to the Court indicates that at this point in 1996, Mr. Thompson had sold his real estate in England and given away his automobile, and intended to set himself up as publisher of Shop Talk, a magazine he had

19

purchased, in Chicago. (D.E. 76-1 ¶¶ 7-8; Hearing Transcript at 10.) In addition, upon his

arrival in Chicago, Mr. Thompson signed a year-long lease for an apartment, which lease he later

renewed. (Hearing Transcript at 56-57.) Although Mr. Thompson testified at the hearing that he

intended to return to England at some unidentified point in the future, he presented no credible

evidence indicating such an intent.[22] (*Id.* at 8, 10.) Instead, the evidence points to the parties'

joint intention to abandon England and reside for some unspecified amount of time at least in the

Chicago area. When Ms. Brown and Aaron joined Mr. Thompson in Chicago a few months

later, Ms. Brown sold effectively all of her personal belongings and "knew that she and Aaron

would live [in Chicago] for the foreseeable future," or, as Petitioner once put it, for "an

extended" stay in the United States. (D.E. 68-1 ¶ 9.) Both Parties then lived in Chicago in the

same apartment building, with Aaron residing with his mother and Mr. Thompson residing in a

separate apartment, for nearly two years. (D.E. 76-1 ¶ 11.) Precedent teaches that in situations

such as this, where "'the child moves to a new country accompanied by both parents, who take

steps to set-up a regular household together, the period need not be long'" in the new country to

establish a new habitual residence. *Koch*, 450 F.3d at 715 (quoting *Mozes*, 239 F.3d at 1078).

---

[22] Mr. Thompson testified at the hearing that he came to the United States in 1996 on a temporary visa. (Hearing Transcript at 10.) However, the credibility of this testimony is called into question by his deposition testimony, wherein he stated that the time limit on his visa was, as he put it, "indefinite." (D.E. 76-6 at 32.) Although he might have, he has not offered the visa in question into evidence. In either event, the Court finds, based on the evidence offered, that the visa at a minimum allowed Mr. Thompson to remain in the United States on an ongoing basis (although he might need to return to England intermittently on at least some basis) so long as he had legitimate business affairs here. (*Accord* Hearing Transcript at 55.) Furthermore, as explained above, both he and later Ms. Brown came to Chicago (with Aaron), with the intention of making a Chicago-based business a success and they lived here in Chicago in the same building for almost two years. This evidence militates in favor of a finding that the two parents then shared an intention to establish America as their (and Aaron's) "habitual residence" for an indefinite and meaningfully long period of time. *See, e.g., Koch*, 450 F.3d at 715 (quoting *Mozes*, 239 F.3d at 1078).

Aaron left England, his birthplace and theretofore his only place of residence, in 1996, when he was less than one year old. He then lived with both of his parents, both of whom had taken steps to abandon their, and Aaron's, prior habitual residence, without a settled date to return to England, until 1998.[23] Under such circumstances, the Court finds that there was a shared intent to establish a new habitual residence in the United States for Aaron in 1996. *See, e.g., Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004) (holding that where the parents of a young child agreed to move from the United States to Canada for a period of two years and then return to the United States depending on certain conditions, the parents intended to abandon the United States and the habitual residence of the child shifted to Canada); *id.* ("the intent to abandon, need not be forever; rather, intent to abandon a former place of residency of a one year old child for at least two years certainly can effectuate an abandonment of that former habitual residence."); *Koch*, 450 F.3d at 716 (same); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 296 (3d Cir. 2006) (collecting numerous appellate authorities and stating that, "shared parental intent that a very young child will reside in a new country, even for a limited period of time, is sufficient to establish the child's habitual residence in that country."); *Falls v. Downie*, 871 F.Supp. 100, 102 (D. Mass. 1994) (holding that when a child's mother voluntarily allowed the child to move from Germany to the United States to live with the child's father indefinitely, the child had ceased to

---

[23] Although this family living situation may have been somewhat unorthodox, as Aaron did not live in one dwelling with both of his parents, but rather in one multi-unit building where both parents also lived, it nonetheless seems to be analogous to the situation in which a "child moves to a new country accompanied by both parents, who take steps to set-up a regular household together. . . ." *Koch*, 450 F.3d at 715 (citation omitted). Even if Mr. Thompson and Ms. Brown lived in separate apartment buildings, or areas of Chicago, or suburbs of Chicago, their decision to collectively relocate to the Chicago area with Aaron for the indefinite future, under the caselaw discussed above and the facts and circumstances of this case, reflects a shared intent to take up a new habitual residence in Chicago.

21

be a habitual resident of Germany after eight months).

This finding is reinforced by Mr. Thompson's own historical actions and representations. In January 1998, when Ms. Brown left the United States and temporarily returned to England with Aaron, the parties agree that "Mr. Thompson petitioned the Circuit Court of Cook County for an Ex Parte Order of Protection seeking custody of Aaron and to prevent Ms. Brown from removing Aaron from Illinois," which the Court granted, and then later dismissed. (D.E. 76-1 ¶ 18.) Also in 1998, Mr. Thompson filed a "Petition to Establish Paternity and for Custody and Visitation"—in which he "acknowledges Ms. Brown as Aaron's custodial parent" and "asserts that both he and Ms. Brown were permanent residents of Cook County." (D.E. 76-1 ¶ 21; D.E. 68-6.)

> b. *The Parties Shared an Intent For Aaron to Become A Habitual Resident of Illinois Again in the Course of Their Custody Dispute in 1999 and 2000*

Although Mr. Thompson has not specifically made such an argument, an argument might be made that in 1998, when Aaron and Ms. Brown returned without notice to England, Aaron's habitual residence reverted to England.[24] Even if this argument had been made, however, the record establishes that the parties again shared an intent to adopt the United States as their, and Aaron's, habitual residence during the course of their custody proceedings in Cook County,

---

[24] Although the Court need not, and therefore does not, decide whether such an argument would prevail, it notes that the argument seems lacking in support, as no credible evidence was presented indicating that Aaron's parents shared a *joint* intent to abandon the United States as their, and Aaron's, habitual residence at this time. *See Koch*, 450 F.3d at 715. Mr. Thompson testimony that Ms. Brown's statement, in the British proceedings she initiated in 1999, that "My plans for Aaron's accommodation and schooling are firstly that Aaron would continue to reside with me in the United Kingdom" was "consistent" with his thoughts at the time cannot be credited. (Hearing Transcript at 23.) The evidence is simply otherwise. Rather than conceding the jurisdiction of the British courts at this time, Mr. Thompson continued his attempts to litigate his custody action in Cook County, Illinois, where he resided at the time. (Hearing Transcript at 24; D.E. 76-1 ¶¶ 21, 23.)

Illinois, in 1999 and 2000. At that time, when Mr. Thompson's representations to the Circuit Court of Cook County resulted in the dismissal of Ms. Brown's "application for a residence" by the High Court of England "on the basis that Mr. Thompson would be pursuing further applications in the U.S.," Ms. Brown enrolled Aaron in school in the Chicago area, where he has attended full-time ever since. (D.E. 76-1 ¶ 23; D.E. 76-1 ¶ 24; Hearing Transcript at 118.)

Mr. Thompson's attempts to prevent Ms. Brown from removing Aaron from Illinois in 1998, combined with his obvious desire to litigate custody issues in the United States instead of England, followed by Ms. Brown's return to the United States with Aaron in 1999 "until a resolution to the custody proceedings was reached," also indicate a shared intent to reside in Illinois for the indefinite future.[25] Although Ms. Brown's testified that she was initially "forced against her will and against her intention to return to the U.S." to continue this custody battle (Hearing Transcript at 100), she also testified that during the course of the lengthy underlying proceedings, at some point in early 2000, as the Cook County proceedings drew on and she began to date her now fiancé Leonardo Sanders, her intention to return to the United Kingdom changed. (Hearing Transcript at 119-121.) This testimony is substantially bolstered by the fact that Ms. Brown has remained in the United States ever since. (*Id.*) This understandable change of heart by Ms. Brown about the idea of even returning to England at all, combined with Mr. Thompson's residence here and desire to litigate Aaron's custody issues here,[26] meant that the

---

[25] Notably, Mr. Thompson himself testified that there was an "agreement" between him and Ms. Brown to continue the custody proceedings in the United States, rather than in the United Kingdom, in 1999. (Hearing Transcript at 29.)

[26] *See also* Hearing Transcript at 83 (Mr. Thompson stating that he has always wanted Aaron to reside in the same place as he was residing); D.E. 5, Ex 2 at 5 (January 2002 application by Mr. Thompson to English courts for an order by which he could take Aaron "to live with me in the USA.").

23

parents shared a joint intent to have Aaron habitually reside for the indefinite future in the United States as the custody proceedings progressed in 1999 and 2000. Moreover, commonsense (and the parties' experiences) render obvious the fact that custody proceedings may not be resolved quickly, and therefore Ms. Brown and Aaron faced the prospect of a potential, extended stay in the United States (which is indeed what has occurred). Under such circumstances, precedent and the record support the idea that Aaron's habitual residence, as reflected by the shared intent of his parents, again became Chicago. *Accord, e.g., Karkkainen,* 445 F.3d at 296; *Whiting,* 391 F.3d at 550.

This scenario would fairly be likened to the fact-dependent, middle-ground scenario identified in *Koch—i.e.,* a case where the petitioning parent "consented to let the child stay abroad [*i.e.,* away from England] for some period of ambiguous duration." *Id.,* 450 F.3d at 713. In such a scenario, "the circumstances surrounding the child's stay may sometimes suggest that, despite the [possible] lack of perfect consensus, the parents intended the stay to be indefinite, leading to an abandonment of the [putative] prior habitual residence." *Id.* (internal citations omitted). Thus, to the extent Aaron somehow relocated to his prior habitual residence when he returned to England temporarily in 1998—to which return his father objected (*see, e.g.,* Hearing Transcript at 17 & Hearing Ex. 4)—the Court concludes that there was a shared intent by his parents to resume habitual residence for Aaron in Chicago in 1999 or perhaps 2000. At that time, Ms. Brown returned to Chicago with Aaron, had enrolled him in school here, became engaged in a romantic relationship with an American who is now her fiancé, and, as a result of all these factors, as well as the lengthy litigation at issue here, decided that she intended to remain indefinitely with Aaron in the United States. *Accord Koch,* 450 F.3d at 715 (collecting

24

cases and using the parents' last shared intent to determine habitual residence of small child).

Mr. Thompson also was (and had been) resident here, and he had pushed for the child custody proceedings to be resolved here.

         3.     Physical Presence In a Particular Location is Not Sufficient to Make A
                 Child a Habitual Resident

     Petitioner argues that although Aaron did reside in the United States for two extended periods (which he asserts occurred between 1996 through 1998 and again between 1999 and 2001), "neither one immediately preceded Respondent's wrongful retainment of Aaron that began in early 2002" and, therefore, "both periods of time are irrelevant for the determination of Aaron's habitual residency." (D.E. 78 at 5.) As discussed above, however, Petitioner respectfully misapprehends the applicable precedent, which instructs the Court to "focus[] on the parents' last shared intent in determining habitual residence," rather than the physical location of the child immediately preceding the allegedly wrongful detainment. *Koch*, 450 F.3d at 715 (citing, *e.g.*, *Gitter v. Gitter*, 396 F.3d 124, 131 (2d Cir. 2005)), which found the *Mozes* opinion "particularly instructive" in determining habitual residence by considering the intentions of the parents as of the last time their intentions were shared). As discussed above, such an analysis on the record in this case leads to the finding that Aaron's habitual residence was Illinois.[27]

---

[27] In support of his claim that Aaron did not reside in the United States from 2001, Mr. Thompson also states that "the last Cook County Court Order entered in [the custody] case states that the U.K. Courts have jurisdiction over the custody matter because it has determined that the Respondent and Aaron returned to the U.K." (D.E. 76-1 ¶ 60.) The document petitioner cites, an October 19, 2001 order attached to Petitioner's Response to Respondent's L.R. 56 Statement of Facts as Exhibit E (Hearing Ex. 31), however, indicates that the Cook County Court made no determination that Aaron and Ms. Brown had returned to England, but rather merely stated that Mr. Thompson represented as much to the court. (D.E. 76-11, Exhibit E.) Respondent cites to and offers copies of Aaron's school records from Holmes Elementary indicating that Aaron attended school there during the 2001-2002 school year, during which he attended 159.5 days of school between September 4, 2001 and June 7, 2002 and was absent only 16.5 days. (D.E. 68-17 at 3-4.) Even were the Court to disregard the school records, however, Ms. Brown

Therefore, even accepting as true Plaintiff's allegation that Aaron was present in England at some point in 2001, there is no evidence of a shared intent on the part of his parents at that time that England (as opposed to the United States) should become Aaron's habitual residence. This point is underscored by Petitioner's own January 29, 2002 Application in England pursuant to the Children Act 1989, in which he sought leave to take Aaron to "live with me in the USA" (D.E. 5, Ex. 2 at 5), which seems clearly to indicate that Petitioner did not intend for Aaron to abandon the United States as his habitual residence.[28]

Moreover, the Court would be remiss if it did not emphasize that there is no meaningful evidence that Aaron relocated to England in late 2001 or early 2002 or even was there for any meaningful period of time. This argument appears to be predicated primarily on the idea that Ms. Brown was served with legal process in England on February 5, 2002. However, as explained already, the evidence that Ms. Brown even was served in the United Kingdom on that date is ambiguous (she denied being served, and was credible in that regard; and the documentary evidence of service, as explained earlier (*see* page 9, *supra*) is ambiguous). Even more to the

---

credibly testified that Aaron attended Holmes Elementary during the 2001-2002 and 2002-2003 school years and that he has never attended school outside the United States. (Hearing Transcript at 118.) Therefore, even assuming, *arguendo*, that the Court should accept the argument that Aaron's habitual residence should be determined only by looking at the "limited period of time immediately prior" (D.E. 78 at 4) to Respondent's allegedly wrongful detainment of Aaron on March 5, 2002, the admissible evidence fails to support Petitioner's position that Aaron was a habitual resident of England in early 2002 or any time that year or in 2001.

[28] Although it is not outcome determinative because the Court relies the teachings of *Koch*, 450 F.3d 703 (7th Cir. 2006), in rendering its opinion in this matter, it is worthy of note that authority cited by both parties similarly supports the conclusion that Aaron was a habitual resident of Illinois in 2002 and that any alleged visits to England would not alter this analysis. *See Tabacchi v. Harrison*, No. 99 C 4130, 2000 WL 190576, *9 (N.D. Ill. Feb. 10, 2000) (Gottschall, J.) (finding a child to be habitually resident in Italy when it had never left Italy except for vacations and trips for parent's work); *Fabri*, 221 F. Supp. 2d at 869-70 (one month visits in United States do not alter a child's habitual residence in Italy).

point, whether Ms. Brown was served on a single day in February 2002 in England hardly shows that she or Aaron were resident there. As discussed, substantial, credible evidence—including documentation from third-party school officials, Ms. Brown's testimony, and Mr. Thompson's admission—confirms that Aaron was enrolled full-time in school in Illinois for the 2001-02 school year and adjoining years. Although at the hearing Mr. Thompson appeared to alter his prior position and stated vaguely that "I believe all the indications . . . friends, family, people we had spoken to" suggested that Aaron was in England at this time, this testimony is rendered non-credible by the fact that Mr. Thompson never identified even one person who told him as much by name, nor did he offer any testimonial or documentary evidence from these "people" attesting to having seen Aaron in England at any time. (Hearing Transcript at 40.) Mr. Thompson also previously conceded that he cannot identify a single person who has even seen Aaron in England since 1998, and Mr. Brown has offered unrebutted and credible evidence that Aaron has not been in England for more than two weeks since 1998. (D.E. 68-1 ¶ 59; Hearing Transcript at 120-121.) Likewise, Mr. Thompson himself testified that he and his attorneys had undertaken comprehensive searches of databases in the United Kingdom—including elementary school databases, national health records,[29] and voters and tax rolls—and these searches gave no indication that Aaron or Ms. Brown lived in the United Kingdom after 1999. (*See, e.g.*, Hearing Transcript at 44-46, 71; *see also* D.E. 5, Ex. 11 at 2 (document in which Mr. Thompson lists no

---

[29] England, of course, has a nationalized health service. *See, e.g.*, http://www.nhs.uk/England/AboutTheNhs/Default.csmx (describing the National Health Service of the United Kingdom as "now the largest organisation in Europe") (last visited Dec. 29, 2006). Therefore, a search of this national health service database— particularly concerning a child of the age in which children are routinely given immunizations and check-ups for school enrollment purposes—is a substantial indicator of whether a child actually was (or was not) residing in England during the period of time at issue.

address in the United Kingdom for Aaron after 1998 and instead lists addresses in and around Chicago).)[30]

Mr. Thompson further argues that "[t]he Court would . . . set a dangerous precedent by holding that Respondent altered Aaron's habitual residence by removing him from England without the knowledge, consent or agreement of the Petitioner." (D.E. 78 at 4.) However, this is not, respectfully, a concern implicated by the actual facts of this case, as the record indicates that Aaron abandoned England as his habitual residence in 1996, and perhaps again in 1999, with the knowledge and consent of Petitioner. As discussed above, the Parties agree that when Aaron left England with his mother in 1996, it was with the consent and agreement of Petitioner. Moreover, assuming, *arguendo*, that Aaron's "habitual residence" reverted to England when he moved back there with his mother in 1998 (and the "last shared intent" analysis taught in *Koch*, 450 F.3d at 715 (collecting cases), would seem to indicate that it did not, as Petitioner's filings in the Circuit Court of Cook County indicate that he did not share any intent to relocate Aaron's habitual residence from the United States at that time), Aaron and his mother returned to Illinois in 1999 after Petitioner initiated a custody action in Illinois wherein he stated that both he and Respondent were "permanent residents" of Illinois. With the facts of this case in mind, Petitioner's argument that finding the United States to be Aaron's habitual residence presents a slippery slope seems, with all respect, to be unfounded. Mr. Thompson's Petition is predicated on the idea that Aaron was a "habitual resident" of England in early 2002, and—again, with all

---

[30] The searches conducted by Mr. Thompson also reflected that Ms. Brown was not receiving child benefits from the United Kingdom for Aaron during these periods of time. (As Ms. Brown testified, parents in England can obtain certain government benefits and monies for children, irrespective of financial status or need. (Hearing Transcript at 120.)) Ms. Brown explained that she cancelled Aaron's receipt of such monies in 1998. (*Id.*)

respect—there is simply no support for that assertion.

Similarly, the Court respectfully rejects Petitioner's arguments that Aaron is not a habitual resident of Illinois because Ms. Brown has not taken many steps to become a legal resident of the United States (none other than her engagement to an American citizen), nor filed a tax return for her business. (D.E. 78 at 5.) Petitioner has failed to cite any authority for his argument that these facts provide a basis for finding that Aaron is somehow instead a habitual resident of *England*, as opposed to the United States, or that the parties shared a joint intent at relevant time periods that Aaron be a "habitual resident" of England as that term has been defined in caselaw.

In this regard, precedent acknowledges that, while immigration issues may sometimes delay[31] (or, the Court can assume *arguendo*, sometimes even prevent[32]) an acquisition of "habitual residence" in a new country, this recognition does not suggest a different outcome here. As explained in the caselaw discussions above, a parent need not intend to relocate with a child

---

[31] *See generally Mozes*, 239 F.3d at 1082 n.45 ("While an unlawful or precarious immigration status does not preclude one from becoming a habitual resident under the Convention, it prevents one from doing so rapidly"); *accord Sasson v. Sasson*, 327 F.Supp.2d 489, 500 (D. N.J. 2004) ("While Petitioner also argues that a change in Maya's [the child's] habitual residence 'could only have occurred if the Sassons [her parents] received immigration status permitting them to reside in the United States permanently,'" that argument is patently wrong. The Ninth Circuit has clearly stated that, 'an unlawful or precarious immigration status does not preclude one from becoming a habitual resident under the Convention'") (citing *Mozes*, 239 F.3d at 1082 n.45) (certain citations omitted for clarity).

[32] In making this assumption—*i.e.*, that immigration issues, in an appropriate case, could prohibit the acquisition of new "habitual resident" status for a child—the Court is going beyond the weight that would appear to be afforded to this consideration in the precedent cited by the parties. Nonetheless, the Court can make this assumption (which is favorable to Petitioner, not Respondent) and it still does not effect the bottom-line result in this case. On the record assembled, any putative immigration issues that presently exist do not change the fact that the parties' last shared intent about Aaron's habitual residence was that it be in the United States (where he has attended elementary school his entire life) and not in England, nor change the fact that Aaron has resided here nearly his entire life of eleven years.

29

for all eternity so as to effect a change in "habitual residence." *See, e.g., Karkkainen*, 445 F.3d at 296 (collecting cases and stating, "shared parental intent that a very young child will reside in a new country, even for a limited period of time, is sufficient to establish the child's habitual residence in that country."). Moreover, Ms. Brown is engaged to an American, and appears to be committed to remaining here.[33]

At all relevant time periods, the record establishes that the parties had a last shared joint intent that Aaron reside in the United States—on an indefinite and extended basis and with no concrete plans to relocate anywhere else, including England. In addition, that intent has seemed to bear out in concrete terms: Aaron has lived in the United States nearly his entire life, and has attended school here since he began pre-school. He is now eleven. To the extent his mother's immigration issues may someday require that he return to England, such possibilities (and handicapping those hypothetical possibilities would be a most uncertain endeavor) do not change the fact that he has been a habitual resident of the United States since at least 1999 or early 2000, including during early 2002, the time period implicated by Mr. Thompson's Petition.

Because the Court finds that Aaron was a habitual resident of the United States on March 5, 2002, and had been since 1999 or early 2000 at least, Petitioner's alleged retention of him in Illinois on that date was not wrongful under the Convention and no further analysis is necessary. *See, e.g., Koch*, 450 F.3d at 710 ("If the habitual residence of the children at the time of their removal was the United States, then . . . [the father's] removal of the children to the United States would not be considered wrongful under the Convention."); *Falls*, 871 F.Supp at 102

---

[33] In this regard, the Court notes that immigration cases (and there is no suggestion that deportation proceedings are even threatened as against Ms. Brown) often are quite protracted, with uncertain outcomes.

(concluding analysis after determining that children were habitual residents of the United States at the time of the allegedly wrongful removal). As a result, the Court need not address Ms. Brown's other, alternative bases by which, she contends, the Petition should be dismissed.

Finally, the Court notes the limited nature of this ruling. This Court does not purport to suggest (nor does it have authority to decide) anything about the underlying child custody fights in which the parties have been variously engaged for years. *See, e.g., Lops,* 140 F.3d at 936 (collecting cases and stating, "[a] court considering an ICARA petition has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute."). The parties are left to all of their arguments, rights, and remedies that may be advanced and obtained in the appropriate child custody proceedings. The Court simply finds that Aaron was not taken or retained outside of his "habitual residence" in England when he was taken to or remained in the United States in early 2002.

## CONCLUSION

For the foregoing reasons, the Court enters judgment in favor of Ms. Brown. Because Mr. Thompson failed to establish that Aaron was a "habitual resident" of England in March 2002, Ms. Brown's retention of Aaron in the United States and/or her taking him to the United States (*i.e.*, his place of habitual residence anyhow) is not proscribed by the Convention. Both Mr. Thompson and Ms. Brown are free to assert whatever issues and arguments they wish concerning custodial and other rights concerning Aaron, but the resolution of those disputes will not entail Aaron's forcible return to England. The Petition is accordingly dismissed.

So Ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: 1/3/07

32